## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 07 2016, 8:36 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Mark Leeman
Amber Garrison
Pulaski County Public Defender
Leeman Law Offices
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Randall L. Grigsby,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

June 7, 2016

Court of Appeals Case No.
66A03-1508-CR-1184

Appeal from the Pulaski Circuit Court

The Honorable Michael Anthony Shurn, Judge

Trial Court Cause No.
66C01-1410-F1-1

**Bradford, Judge.**

# Case Summary

[1] On June 24, 2015, Appellant-Defendant Randall L. Grigsby was found guilty, following a jury trial, of Level 1 felony rape. Grigsby appeals from this conviction, contending that (1) the trial court abused its discretion in including an instruction relating to a lesser included offense, *i.e.*, Level 3 felony rape, in its final instructions to the jury; and (2) the trial court committed fundamental error by admitting certain evidence at trial. Concluding that the trial court did not abuse its discretion in including the challenged instruction in the final jury instructions and that the admission of the challenged evidence did not constitute fundamental error, we affirm.

## Facts and Procedural History

[2] In late-October of 2014, C.C. travelled from Michigan to Indiana to visit his son. While in Indiana, C.C. stayed at the residence of his friend, Grigsby.[1] C.C. had wanted to visit Grigsby during his trip because they had gone to school together and were "good friends." Tr. p. 253.

[3] On or about October 25, 2014, Grigsby, C.C., and two others went to a nearby Walmart. Once at the Walmart, Grigsby returned what he told C.C. were previously stolen items, receiving in-store credit. At Grigsby's instruction, C.C. then used the in-store credit to purchase pseudoephedrine. Grigsby wanted the pseudoephedrine so that one of his relatives could use it in the manufacture of

---

[1] At the time, Grigsby lived with a number of relatives in the residence of Grigsby's grandfather, Forrest Manns.

methamphetamine. Grigsby also purchased a package of syringes from Walmart.

[4] After leaving Walmart, the group returned to Grigsby's residence. They then gathered in a forest near the residence where Grigsby's relative would manufacture the methamphetamine. After the manufacture of the drug was complete, Grigsby offered C.C. a syringe filled with the drug. C.C. did not take the syringe, however, because he had quit using methamphetamine after a friend had overdosed on the drug.

[5] Over the course of the rest of the evening, C.C. ingested marijuana and alcohol. Around 10:00 or 11:00 p.m., C.C. went to lay down in an upstairs bedroom by himself because he was not feeling well. The next thing C.C. remembered was being awakened by Grigsby sticking a syringe "in [his] arm" and "pushing in on the syringe." Tr. pp. 273, 274. C.C. quickly lost consciousness with the syringe still in his arm.

[6] When C.C. regained consciousness, he was face down on the bed. C.C. noticed that his pants had been removed and that Grigsby was raping him from behind with Grigsby's penis penetrating his anus. C.C. later recalled that this penetration "hurt really bad." Tr. p. 276. C.C. cried and told Grigsby to stop before again losing consciousness. When C.C. next regained consciousness, Grigsby was choking him and yelling for C.C. to give him oral sex. C.C. then passed out yet again.

When C.C. awoke in the morning, he was fully clothed and Grigsby was placing him in a rocking chair. In an attempt to get away from Grigsby, C.C. left the residence and went to the nearby woods. C.C. called his brother, who eventually picked C.C. up from Grigsby's residence and took him back to Michigan. Soon after arriving back in Michigan, C.C.'s brother and mother convinced him to seek medical attention. The incident was subsequently reported to law enforcement officials in Pulaski County.

On November 6, 2014, Appellee-Plaintiff the State of Indiana (the "State") charged Grigsby with two counts of Level 1 felony rape and one count of Level 3 felony rape. The charging information was later amended, with the State dismissing one of the counts of Level 1 felony rape and the Level 3 felony rape. Grigsby was subsequently alleged to be a habitual offender.

Following trial, a jury found Grigsby guilty of Level 1 felony rape. The jury also determined that Grigsby was a habitual offender. On July 22, 2015, the trial court sentenced Grigsby to a thirty-five-year term in relation to the Level 1 felony rape conviction. The trial court enhanced Grigsby's sentence by a term of ten years by virtue of his status as a habitual offender. This appeal follows.

# Discussion and Decision

# I.  Lesser Included Jury Instructions[2]

In every criminal case, an accused is entitled to clear notice of the charge or charges against which the State summons him to defend.  Clear notice serves the dual purposes of allowing an accused to prepare his defense and of protecting him from being placed twice in jeopardy for the same offense.  When, therefore, the issue is under what circumstances a trial court should instruct a jury on a lesser included offense of that charged, it is essential that the appellate courts of this state speak with one voice.  What we say will determine both how prosecutors draft indictments and informations and what notice defendants in criminal cases will have of the charges brought against them.  Due process will brook no confusion on the subject.

*Wright v. State*, 658 N.E.2d 563, 565 (Ind. 1995) (internal citations omitted).

"The purpose of a jury instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict."  *Isom v. State*, 31 N.E.3d 469, 484 (Ind. 2015) (internal quotation omitted).  "We review a trial court's instructions to the jury for an abuse of discretion."  *Id*.  "An abuse of discretion

---

[2] The State initially asserted that Grigsby had waived his appellate challenge to the inclusion of the lesser included jury instruction because the record is unclear as to the grounds on which Grigsby objected to the inclusion of the instruction.  In response, Grigsby requests that the instant appeal be stayed for a period of sixty days during which time his counsel would prepare an Indiana Appellate Rule 31 Statement of the Evidence setting forth the grounds on which Grigsby objected to the instruction at issue.  Despite the State's assertion to the contrary, we find that the record is sufficient to preserve Grigsby's instant challenge for appeal and will therefore decide the issue on its merits.  As such, we do not find it necessary for Grigsby's counsel to prepare an Appellate Rule 31 Statement of the Evidence and hereby deny his request to stay the matter for a period of sixty days.

arises when the instruction is erroneous and the instructions taken as a whole misstate the law or otherwise mislead the jury." *Id.* at 484-85.

[12] Grigsby contends that the trial court erred in instructing the jury regarding the lesser included offense of Level 3 felony rape over his objection. Grigsby asserts on appeal that the trial court should only have instructed the jury regarding the charged offense, *i.e.*, Level 1 felony rape. Although the final jury instructions included instructions relating to both Level 1 felony rape and the lesser included offense of Level 3 felony rape, the jury found Grigsby guilty of Level 1 felony offense, *i.e.*, the charged offense. Nothing in the record suggests that inclusion of the lesser included offense misled the jury or in any way affected the jury's ability to clearly comprehend the case or to arrive at a just, fair, and correct verdict. Given that Grigsby was found guilty of the more serious charged offense of Level 1 felony rape, we note that even if the trial court could have been found to have abused its discretion in instructing the jury regarding the lesser included offense, which we do not believe the trial court did for the reasons stated below, we cannot see how Grigsby was prejudiced by the inclusion of the lesser included offense. Thus, we do not believe that the trial court abused its discretion in instructing the jury regarding the lesser included offense.

[13] Furthermore, we note that the Indiana Supreme Court has held that it constitutes reversible error for a trial court to fail to instruct the jury as to a lesser included offense when that lesser included offense is an inherently included offense to the principal charge and there is a serious evidentiary

dispute regarding the element that distinguishes the lesser offense from the principal charge. *Id*. at 485 (citing *Wright*, 658 N.E.2d at 567). An offense is inherently included if (a) the alleged lesser included offense may be established by proof of the same material elements or less than all the material elements defining the crime charged, or (b) the only feature distinguishing the alleged lesser included offense from the crime charged is that a lesser culpability is required to establish the commission of the lesser offense. *Jackson v. State*, 33 N.E.3d 1067, 1071 (Ind. Ct. App. 2015), *trans. denied*; *True v. State*, 954 N.E.2d 1105, 1108 (Ind. Ct. App. 2011).

> A serious evidentiary dispute exists where the jury can conclude that the lesser offense was committed and the greater offense was not. *Chanley v. State*, 583 N.E.2d 126, 130 (Ind. 1991). In determining whether there is a serious evidentiary dispute, *Wright* and its progeny dictate that the evidence presented by both the State and the defense must be taken into account. *Webb v. State*, 963 N.E.2d 1103, 1107 (Ind. 2012).

*Jackson*, 33 N.E.3d at 1072.

[14]    Again, review of the record reveals that in addition to an instruction relating to the charged offense of Level 1 felony rape, the trial court instructed the jury on the lesser included offense of Level 3 felony rape. This instruction was given at the State's request and over Grigsby's objection. Indiana Code section 35-42-4-1 provides, in relevant part, that:

> (a) Except as provided in subsection (b), a person who knowingly or intentionally has sexual intercourse with another person or

knowingly or intentionally causes another person to perform or
submit to other sexual conduct … when:
> (1) the other person is compelled by force or
> imminent threat of force; [or]
> (2) the other person is unaware that the sexual
> intercourse or other sexual conduct … is occurring; []
> ****

commits rape, a Level 3 felony.

(b) An offense described in subsection (a) is a Level 1 felony if:
> ****
> (4) the commission of the offense is facilitated by
> furnishing the victim, without the victim's
> knowledge, with a drug … or a controlled substance
> … or knowing that the victim was furnished with the
> drug or controlled substance without the victim's
> knowledge.

The language of Indiana Code section 35-42-4-1 demonstrates that the offense
of Level 3 felony rape may be established by proof of less than all of the
material elements of Level 1 felony rape.  As such, we conclude that Level 3
felony rape is an inherently included offense of Level 1 felony rape.

[15]   Having concluded that Level 3 felony rape is an inherently included offense of
Level 1 felony rape, we must next determine whether a serious evidentiary
dispute existed by which the jury could have concluded that Grigsby committed
the lesser offense of Level 3 felony rape but not the greater offense of Level 1
felony rape.  At trial, the State presented evidence that Grigsby drugged C.C.,
without C.C.'s knowledge, while C.C. slept, in furtherance of his act of raping
C.C.  Specifically, the State presented evidence indicating that (1) C.C. did not
knowingly ingest or inject himself with methamphetamine on the night in

question, (2) C.C. did not regularly use methamphetamine, (3) C.C. awoke to find Grigsby injecting him with a syringe containing what he believed to be methamphetamine and sexually assaulting him, and (4) preliminary medical tests taken when C.C. sought treatment hours after he was raped by Grigsby indicated that C.C. had methamphetamine in his system.

[16] In presenting his defense, Grigsby challenged this evidence by presenting evidence indicating that one of Grigsby's relatives had observed C.C. inject himself with methamphetamine on the night in question. Grigsby also disputed the State's evidence by questioning C.C. about his body's reaction after allegedly being injected with methamphetamine by Grigsby. During this line of questioning, C.C. admitted that the usual effect methamphetamine had on his body was to make him "wake up" rather than making him lose consciousness as he alleged happened in this instance. Tr. p. 313. Grigsby's counsel also questioned the nurse who treated C.C. about whether any of the drugs for which C.C. was prescribed could have caused the positive drug test. Upon review, we find that the evidence presented by Grigsby sufficiently created an evidentiary dispute by which the jury could have reasonably concluded that Grigsby had committed the lesser offense of Level 3 felony rape but not the greater charged offense of Level 1 felony rape.

[17] Again, we conclude that Level 3 felony rape is an inherently included offense of Level 1 felony rape. We also conclude that a serious evidentiary dispute exists where the jury could have reasonably concluded that the lesser offense of Level 3 felony rape was committed and the greater offense of Level 1 felony rape was

not. In light of these conclusions, it was not error for the trial court to give the requested lesser included instruction. Indeed, it would have been reversible error for the trial court to refuse to do so. *See Isom*, 31 N.E.3d at 485 (citing *Wright*, 658 N.E.2d at 567).

# II. Admission of Evidence

[18] Grigsby next contends that the trial court abused its discretion in admitting certain evidence at trial.

> The trial court has broad discretion in ruling on the admission or exclusion of evidence. *Gutierrez v. State*, 961 N.E.2d 1030, 1034 (Ind. Ct. App. 2012). The trial court's ruling on review of admissibility of evidence will be disturbed only upon a showing of an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented. *Oatts v. State*, 899 N.E.2d 714, 719 (Ind. Ct. App. 2009). In reviewing the admissibility of evidence, we consider only the evidence in favor of the trial court's ruling and any unrefuted evidence in the appellant's favor. *Redding v. State*, 844 N.E.2d 1067, 1069 (Ind. Ct. App. 2006). As a rule, errors in the admission or exclusion of evidence are to be disregarded as harmless unless they affect the substantial rights of a party. *Id.* In determining whether an evidentiary ruling affected a party's substantial rights, we assess the probable impact of the evidence on the trier of fact. *Id.*

*Kirk v. State*, 974 N.E.2d 1059, 1066 (Ind. Ct. App. 2012).

## A. Admission of Allegedly Repetitious Hearsay

[19] Grigsby asserts that the trial court abused its discretion in admitting what he alleges to be repetitious hearsay at trial.

## *1. The Rule Against Hearsay*

[20] "Hearsay" is defined as "a statement that: (1) is not made by the declarant while testifying at the trial or hearing; and (2) is offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). Hearsay is not generally admissible unless the Rules of Evidence or "other law provides otherwise." Evid. R. 802. Indiana Evidence Rule 803(4) provides that one exception to the rule against the hearsay is statements made for medical diagnosis or treatment. This includes a statement that "(A) is made by a person seeking medical diagnosis or treatment; (B) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (C) describes medical history; past or present symptoms, pain or sensations; their inception; or their general cause." Evid. R. 803(4). Another exception to the hearsay rule is records of a regularly conducted activity. Evid. R. 803(6). This includes a record of an act, event, condition, opinion, or diagnosis if:

> (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Evid. R. 803(6). "Among those business records routinely held admissible under Rule 803(6) are medical records." *Perry v. State*, 956 N.E.2d 41, 51 (Ind. Ct. App. 2011). Further, "[h]earsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Evid. R. 805.

### 2. *Whether the Trial Court Abused Its Discretion in Admitting the Allegedly Repetitious Hearsay Evidence*

[21] It is important to note that Grigsby did not object at trial to the admission of any of the challenged testimony or medical records that he now claims amounts to repetitious hearsay. Again, the admission of evidence is generally within the trial court's discretion and we review decisions to allow items into evidence for an abuse of discretion. *Lee v. State*, 967 N.E.2d 529, 534 (Ind. Ct. App. 2012) (citing *Ziebell v. State*, 788 N.E.2d 902, 908 (Ind. Ct. App. 2003)). "However, where a party fails to object at the time an item is introduced into evidence, any error in allowing the item into evidence must be fundamental error to warrant reversal." *Id*. (citing *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010)).

[22] "Fundamental error is an exception to the general rule requiring contemporaneous objection that is 'extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process.'" *Id*. (quoting *Brown*, 929 N.E.2d at 207). "This exception applies only to 'egregious circumstances,' and must either 'make a fair trial impossible' or constitute 'clearly blatant violations of basic and

elementary principles of due process.'" *Id*. (quoting *Brown*, 929 N.E.2d at 207). Thus, because Grigsby failed to object to the admission of the challenged evidence at trial, he is only entitled to relief if the claimed error constituted fundamental error. *See id*.

### i. Detective Woodruff

[23] In claiming that the trial court committed fundamental error by admitting certain evidence at trial, Grigsby challenges the testimony of Detective Woodruff. During trial, Detective Woodruff indicated that he was first made aware of the incident in question when Nurse Mindy O'Brien reported C.C.'s allegations to the Pulaski County Sheriff's Department. Detective Woodruff further indicated that after speaking with Nurse O'Brien, he spoke with C.C.. Regarding his initial contact with C.C., Detective Woodruff testified that C.C. gave him "a brief statement in regards to what had taken place[,]" identified the specific location where the incident took place, and identified Grigsby as the person who had "committed [the] act against him." Tr. p. 205. Detective Woodruff further testified that he met with C.C. the day after his initial contact with C.C., at which time C.C. described the events in question as follows:

> Mr. [C.C.] advised on the evening of October 27th he was at the Grigsby residence, and he said later in the evening he had become tired and went upstairs to go to bed. Mr. [C.C.] said he was awoken by a pain in his arm and looked and observed Mr. Grigsby sticking a syringe into his arm and he believed to be injecting an unknown substance into Mr. [C.C.]. Mr. [C.C.] advised that he then felt withdrawn and like a zombie. He stated that he blacked out until eventually coming back to finding himself laying on the ground with his pants removed and Mr.

Grigsby behind him sexually assaulting him. Mr. [C.C.] advised he could feel Mr. Grigsby's penis inside of his anus. He stated this caused pain and claimed to still be in pain at the time of the interview.

Mr. [C.C.] advised he again blacked out or passed out and awoke to Mr. Grigsby standing over him, as [C.C.] was seated in a chair. [C.C.] advised Grigsby was choking him in attempting to force [C.C.] to perform oral sex on the defendant. Mr. [C.C.] advised that the oral sex was completed and had stated that Mr. Grigsby had ejaculated into his mouth. Mr. [C.C.] advised he again blacked out and awoke and found his clothes to be put back on but stated that his zipper was undone[.]

Tr. p. 207. Detective Woodruff testified that C.C. further indicated that he had consumed alcohol and smoked marijuana prior to the attack but that he had not ingested methamphetamine, which he had stopped using "due to a close friend suffering an overdose." Tr. p. 208.

[24] Initially, we note that the challenged portions of Detective Woodruff's testimony constituted inadmissible hearsay. As such, these statements should not have been admitted at trial. However, because Grigsby failed to object to the challenged testimony at trial, he is entitled to relief only if he demonstrates that the inclusion of the challenged testimony constituted fundamental error. *See Lee*, 967 N.E.2d at 534. Grigsby has failed to do so.

[25] While Detective Woodruff testified prior to C.C. testifying at trial, his testimony regarding C.C.'s account was not overly prejudicial such that it denied Grigsby a fair trial. Detective Woodruff merely recounted the version of events provided to him during the course of his investigation. Detective

Woodruff did so in explaining what steps he followed in completing his investigation and why. Detective Woodruff's testimony in this regard was brief, was consistent with C.C.'s subsequent testimony, and did not appear to have elaborated on C.C.'s statement in anyway. Further, Detective Woodruff did not express any opinion as to C.C.'s credibility and even admitted on cross examination that he later learned that C.C. had provided inaccurate or untruthful information with regards to a different portion of the information he provided to Detective Woodruff. As such, we conclude that any error in admitting Detective Woodruff's testimony was harmless. *See generally, McGrew v. State*, 673 N.E.2d 787, 796 (Ind. Ct. App. 1996) (providing that because admission of evidence which is cumulative of other evidence admitted at trial without objection does not constitute reversible error, the trial court did not err in allowing the testimony of two witnesses who provided testimony that was cumulative to that subsequently provided by the victim of a sexual assault), *summarily aff'd on relevant grounds*, 682 N.E.2d 1289, 1292 (Ind. 1997).

## *ii. C.C.'s Brother*

[26] Grigsby next challenges the testimony of C.C.'s brother, Michael. The record reveals that Michael testified that he went to pick C.C. up from Grigsby's residence after C.C. requested a ride and indicated that it was a "life and death situation." Tr. p. 341. Michael indicated that C.C. was quiet during the drive and that he knew "something [was] going on" because it was unlike C.C. to be so quiet. Michael then provided the following testimony regarding what

happened once he picked up C.C. and headed back towards Michael's residence in Michigan:

> A:      … And then eventually he was like he told me what had happened, and I was like what?  And he was like yeah.  I was like well then you need to go to the hospital.
> Q:      What did he tell you happened?
> A:      That he had been raped.
> Q:      Did he say by whom?
> A:      Yeah.
> Q:      Who did he say raped him?
> A:      Randall.

Tr. p. 343.   Upon continued examination by the State, Michael further testified:

> Q:      So he had a difficult time telling you about it?
> A:      Yeah.
> Q:      Did he tell you the whole story all at once or did he spread it out over the trip home?
> A:      Well no, he had only told me he had been raped.  He didn't even tell me a whole lot about it.  He just said that Randall raped him.  And I was like well you need to go to the hospital. To this day I still don't know everything.

Tr. p. 344.

[27]   Similar to the challenged testimony discussed above, we note that the challenged portions of Michael's testimony constituted inadmissible hearsay. As such, these statements should not have been admitted at trial.  However, as was the case with the challenged testimony above, Grigsby is only entitled to relief if he demonstrates that the inclusion of the challenged testimony

constituted fundamental error because he failed to object to the challenged testimony at trial. *See Lee*, 967 N.E.2d at 534. Grigsby has again failed to do so.

[28] Michael's testimony does not repeat the details of C.C.'s account in a manner which would unduly prejudice Grigsby. His testimony merely explains why he picked up C.C. from Grigsby's residence and why he suggested C.C. seek medical attention. Further, Michael testified after C.C. had already testified and his testimony that C.C. indicated that he had been raped by Grigsby was cumulative of and consistent with C.C.'s testimony regarding the events in question.

### *iii. Nurse O'Brien*

[29] Grigsby also challenges the admission of the testimony of Nurse O'Brien, the nurse who treated C.C. at the hospital. Review of Nurse O'Brien's testimony reveals that the alleged hearsay contained in her testimony would fall under the exception to the rule against hearsay for statements made for medical diagnosis or treatment. To the extent that Nurse O'Brien testified about C.C.'s account of what had transpired at Grigsby's residence on the night in question, C.C.'s statements about the incident were made by an individual seeking medical treatment for the purpose of receiving said treatment. Further, Nurse O'Brien only mentioned C.C.'s statements to the extent necessary to explain how she determined what treatment was necessary given C.C.'s situation. *See generally, Palilonis v. State*, 970 N.E.2d 713, 727 (Ind. Ct. App. 2012) (providing that the victim's statements describing the events of her rape were highly important for

making treatment decisions); *Perry*, 956 N.E.2d at 50 (providing that the victim's statements describing the physical attack and identifying the defendant as the assailant were admissible pursuant to Evidence Rule 803(4) because they were pertinent to the diagnosis and treatment of the victim). Because the challenged portion of Nurse O'Brien's testimony falls under the exception to the rule against hearsay for statements made for medical diagnosis or treatment, such statements did not amount to inadmissible hearsay.

### iv. Medical Records

[30] Grigsby last challenges the admission of the medical records relating to C.C.'s treatment at the hospital. The record reveals that the State laid a foundation for the medical records by confirming that Nurse O'Brien had prepared the records as part of her treatment, the records were certified, and the records were kept in the normal course of the hospital's business. Grigsby's counsel was given the opportunity to review the medical records at trial and affirmatively stated that he had no objection to the admission of the said records. Again, "[a]mong those business records routinely held admissible under Rule 803(6) are medical records." *Perry*, 956 N.E.2d at 51. Because the medical records falls within the exception to the hearsay rule for records created as a matter of regularly conducted activity, the records, and any alleged hearsay contained therein, did not amount to inadmissible hearsay. *See generally, id*. (providing that the victim's medical records and the treating nurses observations relayed therein were admissible pursuant to Evidence Rule 803(6) because the records were created in connection to the nurse's contemporaneous evaluation of the victim

and in the course of the hospital's regular business activity of consulting patients and documenting treatment).

### v. Cumulative Effect

[31] Again, Nurse O'Brien's challenged testimony and the challenged medical records relating to C.C.'s treatment at the hospital were properly admitted because both the challenged testimony and the medical records fell under stated exceptions to the rule against hearsay. As such, their admission should not be considered in relation to our fundamental error analysis. Rather, we should consider only the cumulative effect of the testimony presented by Detective Woodruff and Michael.

[32] While it was error to admit the challenged portions of Detective Woodruff's and Michael's testimony, we conclude that such error was harmless. While Detective Woodruff's testimony came before C.C.'s at trial, his testimony recounting the version of the events in question provided by C.C. was brief, was consistent with C.C.'s subsequent testimony, and did not appear to have elaborated on C.C.'s statement in anyway. As we noted above, Detective Woodruff did not express any opinion as to C.C.'s credibility and even admitted on cross examination that he later learned that C.C. had provided inaccurate or untruthful information regarding a different portion of the information he provided to Detective Woodruff. Further, we have found that Michael's testimony, which again came after C.C.'s testimony, was consistent with and cumulative of C.C.'s general assertion that he had been raped by Grigsby. Michael's testimony did not repeat any specifics of the incident.

[33] Upon review, we conclude the cumulative effect of the admission of the challenged testimony was not such that would have rendered a fair trial impossible. As such, any error in admitting the challenged evidence did not amount to fundamental error. Given that Grigsby failed to object to the challenged testimony at trial together with our conclusion that admission of the challenged testimony did not constitute fundamental error, we further conclude that Grigsby is not entitled to appellate relief. *See generally, Lee*, 967 N.E.2d at 534 (providing that an appellant who challenges the admission of evidence on appeal to which he did not object at trial is entitled to relief only if the appellant proves that admission of the evidence in question amounted to fundamental error).

## B. Admission of C.C.'s Hospital Blood Test Results

[34] Grigsby last contends that the trial court committed fundamental error by admitting C.C.'s hospital blood test results into evidence. Specifically, Grigsby challenges the unconfirmed presumptive test result for methamphetamine. As was mentioned above, Grigsby acknowledged that he did not object to the admission of the hospital blood test results at trial. As such, Grigsby is only entitled to relief if the admission of the test results constituted fundamental error. *See id.*

[35] Focusing on the foundational requirements for the admission of evidence, Grigsby asserts that Nurse O'Brien failed to provide an adequate foundation for the results, and, as such, the results should have been excluded at trial. Nurse O'Brien testified that the medical records at issue were certified hospital records

created during the course of a medical evaluation of C.C. and were kept in the normal course of the hospital's business. The State argues that the records in question were admissible because medical records are inherently reliable because failure to provide accurate medical laboratory test results in the course of patient treatment "would inevitably lead to profoundly deleterious outcomes." Appellee's Br. p. 23. Grigsby, on the other hand, claims that Nurse O'Brien did not adequately prove that the scientific principles used in creating the challenged records satisfied the requirements of Indiana Evidence Rule 702.

[36] While medical records may not be excluded as hearsay, any medical opinions and diagnosis contained in such records must meet the requirements for expert opinions set forth in Evidence Rule 702.[3] *Brooks v. Friedman*, 769 N.E.2d 696, 701 (Ind. Ct. App. 2002). Review of the medical records at issue, however, demonstrates that the challenged medical records do not contain medical opinions and diagnosis. Instead, the records merely contain laboratory test results. The records merely presumptively indicated that methamphetamine

---

[3] Evidence Rule 702 provides as follows:

(a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

(b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

was present in C.C.'s blood at the time it was tested during the normal course of his treatment at the hospital.

[37] The records contain no opinion as to how or when the methamphetamine entered C.C.'s bloodstream. While C.C. testified that he did not willingly ingest methamphetamine on the day in question, at least one of Grigsby's relatives testified that he had seen Grigsby inject himself with methamphetamine. If the jury were to believe this testimony, the testimony would explain the presumptive result in Grigsby's favor.

[38] Again, Grigsby did not object to the admission of the challenged medical records at trial. Grigsby has failed to convince us on appeal that the admission of these medical records constituted fundamental error. As such, we conclude that Grigsby is not entitled to relief in this regard.

# Conclusion

[39] In sum, we conclude that the trial court did not abuse its discretion in including the instruction relating to the lesser included offense of Level 3 felony rape in its final instructions to the jury. We also conclude that the admission of the challenged testimony and the challenged medical records did not constitute fundamental error. As such, we affirm the judgment of the trial court.

[40] The judgment of the trial court is affirmed.

Altice, J., concurs.

Bailey, J., concurs in result with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

Randall L. Grigsby,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

Court of Appeals Case No.
66A03-1508-CR-1184

[41] I agree with the majority's result. However, because it is not our place to create arguments for the appellant, I believe we should not reach the merits of challenges waived by Grigsby as to certain items of hearsay evidence.

[42] Generally, failure to object at trial results in the waiver of a claimed error on appeal. *Benson v. State*, 762 N.E.2d 748, 755 (Ind. 2002). An exception to that waiver occurs only when "our extremely narrow fundamental error exception" is satisfied. *Id.*

> To qualify as fundamental error, "an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible." *Willey v. State,* 712 N.E.2d 434, 444-45 (Ind. 1999) (citations omitted). To be fundamental error, the error "must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process." *Wilson v. State,* 514 N.E.2d 282, 284 (Ind. 1987). *See also Ford v. State,* 704 N.E.2d 457, 461 (Ind.1998) ("This Court views the fundamental error exception to

the waiver rule as an extremely narrow one, available only 'when the record reveals clearly blatant violations of basic and elementary principles [of due process], and the harm or potential for harm [can]not be denied.'") (quoting *Warriner v. State,* 435 N.E.2d 562, 563 (Ind. 1982)).

*Id.*

[43] Here, Grigsby complains of the admission into evidence, without his objection, of portions of testimony from Detective Woodruff, C.C.'s brother, and Nurse O'Brien, as well as medical records that were admitted along with Nurse O'Brien's testimony. Grigsby baldly characterizes all of this unobjected-to evidence as inadmissible hearsay. But in the absence of anything more than a citation to the basic hearsay rule, Grigsby has waived his argument as to the hearsay evidence. *See* Ind. Appellate Rule 46(A)(8)(a) (requiring cogent argumentation and citation to relevant authority); *Pierce v. State*, 29 N.E.3d 1258, 1267 (Ind. 2015). Having waived in his brief the question of the inadmissibility of the evidence at issue, Grigsby cannot establish error—to say nothing of his ability to meet the extremely high threshold required to establish fundamental error.

[44] Had Grigsby objected, some of the evidence that he identifies as inadmissible hearsay should have been excluded from evidence, namely, Detective Woodruff's and Hall's testimonies relating what C.C. told them about Grigsby's actions. Other evidence—particularly Nurse O'Brien's testimony concerning her clinical findings and the admitted medical records—is clearly admissible and provides corroboration of C.C.'s testimony. *See* Ind. Rule of

Evidence 803(4) and (6). Nevertheless, had there been any error in admitting Detective Woodruff's and Hall's statements, that error would have been harmless within the context of a typical abuse of discretion analysis, let alone under the more stringent standard of fundamental error analysis.

[45] Because of Grigsby's waiver of these arguments, however, I would simply observe that he failed to make arguments and note that it is not our place to create those arguments for him. *See, e.g., New v. Estate of New*, 938 N.E.2d 758, 766 (Ind. Ct. App. 2010) (observing that it is not incumbent upon this Court to "search the record for support" of a party's arguments or "consider issues" left unarticulated). Because I conclude that Grigsby waived his arguments as to the hearsay issues, I cannot join in the majority's analysis of those arguments.

[46] Therefore, I concur in the result.